## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

EUGENE ALEXANDER

Case No. 17-CR-319-3

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

On September 14, 2017, the grand jury returned an indictment against Defendant Eugene Alexander and four other codefendants. [103]. The indictment charged Defendant with possession with intent to distribute at least 500 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count Three). *Id*. The indictment alleged that law enforcement found the narcotics in Defendant's vehicle following an April 11, 2016 traffic stop.

Defendant has moved to suppress all evidence derived from the stop, including narcotics and a cell phone. [192]. Defendant claims that the stop violated the Fourth Amendment, and thus, this Court should suppress all evidence derived therefrom as "fruit of the poisonous tree" under *Wong Sun v. United States*, 371 U.S. 471 (1963) and its progeny. For the reasons explained below, this Court denies Defendant's motion.

## I.    Findings of Fact

This Court held a two-day evidentiary hearing on April 19, 2019 and May 15, 2019, during which it heard sworn testimony from four law enforcement officers

1

involved in the wiretap investigation and Defendant's vehicle stop. Having considered the evidence presented, the parties' written submissions, and oral arguments, this Court makes the following findings of fact.

### A.    Joint DEA-FBI Wiretap Investigation

In 2014, the Drug Enforcement Administration ("DEA") and Federal Bureau of Investigations ("FBI") began a long-term investigation of Drug Trafficking Organizations ("DTO") engaged in large scale narcotics distribution, including heroin, cocaine, and fentanyl, and money-laundering offenses in Chicago and the surrounding Chicagoland areas. [204-1] at 20. A joint FBI/DEA Organized Crime Drug Enforcement Task Force called "Strike Force Four" conducted the investigation. DEA Special Agent John Gildein acted as the lead case agent on the task force. Special Agent Gildein has worked for the DEA since 2012, and he and his fellow task force members have received extensive training as law enforcement officers. Tr. [240] 9:21.

In early 2016, the Ricardo Castaneda DTO became the active focus of surveillance activity. Tr. [241] 74:17–22. Among other individuals, the investigation initially targeted Jose Hermosillo, Jose Mendez, Refugio Castaneda, Ricardo Castaneda, Santos Godina, and William Lawler. [204-1] at 20. As part of the investigation, law enforcement agents utilized multiple techniques including: (1) interviews with confidential sources and cooperating defendants; (2) physical surveillance; (3) telephone records; (4) pen register and cell phone location services; (5) controlled purchases of narcotics; (6) consensually-recorded meetings and phone calls;

2

and (7) court-authorized intercepts of wire and electronic communications. *Id.* at 4–8.[1] Throughout the investigation, Special Agent Gildein and fellow Task Force Officer ("TFO") Special Agent Jim McGreal regularly briefed the remaining task force members. Tr. [240] 22:5–12; Tr. [241] 141:19–25. These briefings included surveillance packets and photographs, which identified various suspects, targeted vehicles, suspect residences, associated phone numbers, and other information uncovered during the investigation. Tr. [240] 23:5–10; Tr. [241] 142:6–11. As part of this process, between May 2014 and April 2016, law enforcement interviewed four independent confidential sources and cooperating defendants, all of whom provided information concerning codefendants Ricardo Castaneda and Santos Godina. [204-1] at 23–32.

### B.    Information from Cooperating Defendant #2

Between May 2014 and April 2016, law enforcement interviewed Cooperating Defendant # 2 ("CD-2") on multiple occasions. *Id.* at 23. CD-2 cooperated with law enforcement with the hope of receiving a benefit at sentencing in a state narcotics case. *Id.* at 23 n.3. CD-2 told law enforcement that he/she sold heroin for six to seven years.

---

[1]On June 17, 2016, Chief Judge Ruben Castillo granted the Government's 18 U.S.C. § 2518 ("Title III") application to intercept wire and electronic communications occurring to and from Target Telephone 14 (a phone used by codefendant Ricardo Castaneda). As required by Title III, the Government submitted a supporting affidavit from Special Agent Gildein for Judge Castillo's consideration. *See* [204-1]. Among other things, the affidavit provided information gathered from cooperating sources regarding co-defendants Ricardo Castaneda and Santos Godina. *Id* at 6–7. At the evidentiary hearing, this Court admitted without objection the supporting affidavit as "Government's Exhibit 1." The parties did not dispute the truth of affidavit's factual content and instead merely disputed what reasonable inferences could be drawn from those facts. Tr. [240] 5:2–25, 7:1–14. As such, this Court accepts the factual content of the affidavit (which is incorporated herein by reference) for the purposes of Defendant's motion.

*Id.* at 23. Jose Mendez supplied CD-2 with heroin. *Id.* From approximately early 2012 until August 2013, CD-2 acted as Mendez' primary driver, driving him to meet with numerous individuals for the purpose of exchanging narcotics and narcotics proceeds. *Id.* at 24. Mendez received narcotics from the Castaneda DTO's members, including an individual named "Cocos," later identified as Refugio Castaneda. *Id.* CD-2 stated that the Castaneda DTO provided Mendez with a cell phone when delivering narcotics. *Id.* The Castaneda DTO used the new cell phone to communicate future narcotics transactions. *Id.*

### C. Information from Cooperating Source #2

On January 20, 2015, law enforcement interviewed Cooperating Source #2 ("CS-2"). *Id.* at 25. CS-2 has provided information to law enforcement since the summer of 2014, when it found him in possession of 17 pounds of cannabis. *Id.* CS-2 cooperated for consideration regarding those charges. *Id.* at 25 n.5. CS-2 provided information regarding Jose Hermosillo and brothers Ricardo and Refugio Castaneda. *Id.* at 25–26. Jose Hermosillo currently remains a fugitive in Mexico.[2] *Id.* at 25. CS-2 received most of his/her information from two individuals, both of whom self-identified as the DTO's workers. *Id.*

---

[2] In 2010, the government charged Hermosillo with conspiracy to distribute five kilograms or more of cocaine. Indictment at [13], *United States v. Jose Hermosillo*, No.10-CR-00041 (N.D. Ill. 2010). After being released on bond, Hermosillo fled from the Northern District of Illinois and has remained a fugitive ever since. [204-1] at 21.

CS-2 also told law enforcement that he/she met Hermosillo and knew him to be a narcotics distributor in Chicago and the surrounding Chicagoland area. *Id*. at 25. Hermosillo transported narcotics from Mexico to Mendota, Illinois, using semi-trucks; each shipment contained approximately 40 to 50 kilograms of heroin. *Id*. The trucks transported heroin to a residence located in Arlington, Illinois. *Id*. Upon arrival, the Castaneda brothers unloaded and distributed the heroin in Chicago. *Id*. Afterwards, the Castaneda brothers loaded and transported the drug proceeds via semi-trucks back to Hermosillo in Mexico. *Id*. Furthermore, CS-2 told law enforcement that the Castaneda brothers used several employees to transport narcotics and money between Mendota and Chicago. *Id*. The couriers included William Lawler and Santos Godina. *Id*. William Lawler, Ricardo Castaneda's brother-in-law, bragged to CS-2 about making $5,000 per month working for the Castaneda brothers. *Id*. at 25–26.[3]

### D.    Information from Cooperating Defendant #3

Between January 2, 2015 through January 16, 2015, Cooperating Defendant #3 ("CD-3") distributed approximately 7.3 grams of cocaine to a cooperating source. *Id*. at 26 n.8. On January 19, 2015, law enforcement officers searched CD-3's residence

---

[3] In corroboration of CS-2's interviews, law enforcement had contact with Lawler on numerous occasions. For example, in January 2015, Special Agent Gildein learned of an incident where LaSalle County law enforcement conducted a traffic stop of Lawler, seizing approximately $207,000 from Lawler's vehicle. Tr. [240] 16:4–9, 17:11–18:14. Further, in August 2015, CS-2 provided LaSalle County law enforcement officers with other reliable information regarding Lawler. [204-1] at 26 n.7. CS-2 indicated that Lawler traveled to the Chicagoland area, returning to LaSalle County with a large amount of United States currency in his vehicle. *Id*. Law enforcement officers conducted a traffic stop, seizing approximately $120,000 from Lawler's vehicle. *Id*.

pursuant to a search warrant. *Id.* During the search, law enforcement seized $1,649 in suspect narcotics proceeds, approximately 165 grams of cocaine, a digital scale, and vehicle records under William Lawler's name. *Id.* Consequently, the state charged CD-3 with a narcotics-trafficking offense. *Id.*

On January 19, 2015, CD-3 identified Ricardo Castaneda as his/her cocaine supplier. *Id.* at 26. CD-3 stated that he/she learned about the narcotics distribution from William Lawler and Santos Godina. *Id.* Lawler and Godina stated that the Castaneda brothers received the narcotics; then, Godina distributed the narcotics both locally in Mendota as well as in the larger Chicago area. *Id.*

On March 18, 2015, law enforcement interviewed CD-3 a second time. *Id.* Again, CD-3 identified Ricardo Castaneda as his/her primary cocaine supplier. *Id.* at 28. CD-3 further stated that in the summer of 2013, Castaneda instructed CD-3 to contact Castaneda's worker, Santos Godina, to purchase cocaine. *Id.* On a weekly or bi-weekly basis, CD-3 purchased cocaine from Godina; each purchase measured between one to six ounces. *Id.* CD-3 paid Godina approximately $500 per ounce of cocaine. *Id.* On some occasions, Godina provided cocaine on credit when CD-3 did not possess funds available upon purchase. *Id.* Godina supplied cocaine to CD-3 until CD-3's arrest. *Id.*

On multiple occasions, CD-3 drove with Godina in Godina's vehicle to pick up narcotics from unknown individuals for the Castaneda brothers. *Id.* For example, in the summer of 2014, CD-3 rode as a passenger in Godina's vehicle as Godina drove to a residence in Aurora, Illinois. *Id.* Upon arrival, Godina entered the residence's garage,

6

while CD-3 waited in the vehicle. *Id.* Minutes later, Godina exited the garage carrying a garbage bag, which Godina stated contained an unknown amount of cocaine. *Id.* Godina placed the bag inside the vehicle's trunk before departing and traveling back to Mendota, Illinois. *Id.* at 28–29.

CD-3 further stated that he/she observed and communicated with the Castaneda brothers and Godina using multiple cell phone numbers. *Id.* at 29. The Castaneda brothers and Godina typically utilized one cell phone for personal calls and at least one other cell phone for their narcotics trafficking operations. *Id.* They changed cell phone numbers approximately every four weeks. *Id.* CD-3 used his/her own cell phone for these communications. *Id.*

### E.    Information from Cooperating Source #3

Law enforcement arrested Cooperating Source # 3 ("CS-3") in a separate investigation involving narcotics distribution. *Id.* CS-3 identified Ricardo Castaneda as his/her source of supply since October 2013. *Id.* at 30. Using a photograph, CS-3 also identified Godina as Castaneda's drug courier. *Id.* at 29–30. CS-3 told law enforcement that he/she purchased between one kilogram to three kilograms of cocaine from Castaneda each time. *Id.* at 30. When CS-3 received three kilograms at once, Castaneda required payment for one kilogram and gave the other two kilograms on credit. *Id.* CS-3 paid Castaneda $34,500 for one kilogram of cocaine. *Id.* CS-3 frequently met Castaneda in and around the Chicagoland area, including at CS-3's

7

residence, to make payments for the narcotics on credit. *Id.* On a few occasions, Castaneda himself delivered CS-3's narcotics. *Id.*

CS-3 and Castaneda communicated multiple times between March 30, 2016 and April 11, 2016. Tr. [240] 19:15–17. With CS-3's consent and judicial authorization, law enforcement recorded these calls and text messages. *Id.* at 19:7–17; [204-1] at 31 n.11. During these calls, CS-3 and Castaneda discussed narcotics availability, pricing, and weight.[4] Tr. [240] at 19:18–21. In the days leading up to and on April 11, 2016, CS-3 and Castaneda communicated multiple times.

On March 30, 2016, CS-3 and Castaneda exchanged numerous recorded phone calls and text messages. [204-1] at 31–36. At 12:12 p.m., Castaneda called CS-3, and during this conversation, CS-3 discussed purchasing narcotics. *Id.* at 33–35. CS-3 indicated that a (fictitious) customer inquired about pricing for one kilogram of heroin. *Id.* at 34. Castaneda replied "fifty-three," meaning $53,000 for one kilogram of heroin. *Id.* Castaneda further stated, "Yeah, there is nothing right now, that's the thing. They're waiting for it." *Id.* Then, CS-3 inquired about purchasing 125 grams of heroin. *Id.* at 34–35. Castaneda again replied, "Yea, there's nothing, nothing right now dude [unintelligible.]." *Id.* at 35. At approximately 12:17 p.m. on the same day, Castaneda called CS-3, and they once more discussed pricing and availability. *Id.* at 35–36.

---

[4] Special Agent Gildein's supporting affidavit, admitted without objection as "Government's Exhibit 1," summarizes CS-3 and Castaneda's recorded phone calls and text messages. [204-1] at 31–39. Again, the parties do not dispute the existence or contents of these communications (which are thus part of the factual record for Defendant's motion).

Castaneda stated: "Yea, we're waiting dude. I had it [heroin] last week but we're waiting for it." *Id*. at 36.

On April 5, 2016, CS-3 and Castaneda spoke again regarding CS-3's purchase of narcotics. Tr. [240] at 20:14–17. Castaneda indicated that he did not have any for CS-3, but expected a shipment in the next couple of days. *Id*. at 20:18–22.

On April 11, 2016, at approximately 9:17 a.m., at Special Agent Gildein's direction, CS-3 sent Castaneda a text message. *Id*. at 20:23–21:7. CS-3 asked Castaneda if any narcotics arrived. [204-1] at 37. At 9:19 a.m., Castaneda responded stating, "Nothing yet maybe tomorrow they said[.]" *Id*.

## F. Physical Surveillance on April 11, 2016

As noted above, based upon the wiretap investigation, law enforcement possessed detailed information that identified Castaneda as a narcotics trafficker who resided in Peru, Illinois, located in LaSalle County, and operated a DTO distributing drugs in the Chicago area. Tr. [240] at 14:13–17; 40:9–10; Tr. [241] at 95:14–20.

On April 11, 2016, at approximately 10:38 a.m. and 10:40 a.m., law enforcement officers received court-authorized location information from Castaneda's two cell phones. [204-1] at 39. The information indicated that Castaneda's cell phones left LaSalle County and were travelling toward the Chicagoland area. *Id*. at 40; Tr. [240] 21:9–11. Given his prior patterns of criminal activity and the recent conversations regarding expected drug shipments, law enforcement officers used the cell phone location information to conduct physical surveillance of Castaneda. [204-1] at 40, 137.

9

During their surveillance, the agents drove separate covert vehicles and remained in contact with one another via radio. Tr. [241] 97:2–7, 160:21–161:1. Over the course of the operation, Special Agents McGreal and Gildein communicated Castaneda's changing cell phone locations to the other task force members. *Id*. at 158:24–159:8.

At approximately 10:49 a.m., using the location information, the agents observed a gray Chevrolet Malibu in a Dunkin Donuts parking lot located near Central Avenue and Belmont in Chicago, Illinois, and then identified Castaneda, who entered the Malibu and drove away. [204-1] at 40; Tr. [241] 191:24–25. Special Agent Gildein followed Castaneda's vehicle as he turned southbound onto 23rd Avenue in Melrose Park, Illinois. [204-1] at 40; Tr. [240] 24:17–23.

At approximately 11:18 a.m., Special Agent Gildein observed Castaneda park on the west side of 23rd Avenue facing southbound, in front of a residence located at 154 23rd Avenue; he then remained in his vehicle. *Id*. at 67:17–20; [204-1] at 40. Special Agent Gildein drove past Castaneda's vehicle and turned onto Main Street. Tr. [240] 25:5–9. Special Agent Gildein maintained radio contact with other law enforcement officers located in the immediate area, all assisting with the surveillance operation. *Id*. at 25:10–12, 17–18. Based upon the investigation and their training and experience, law enforcement believed that Castaneda parked and remained in his vehicle to possibly engage in counter surveillance. *Id*. at 27:16–19; Tr. [241] 108:10–109:3, 114:14–17; Tr. [240] 62:1–3.

On that day, fellow task force officer and Chicago Police Department Sergeant Kevin Sellers assisted with the surveillance operation. Tr. [241] 96:23–97:1. While on surveillance, Sergeant Sellers heard TFOs relay "play-by-play" information over the radio about Castaneda's actions and his vehicle location. *Id*. at 99:20–21. Utilizing that information, Sergeant Sellers turned onto 23rd Avenue where he observed the parked Chevy Malibu on the west side of the street. *Id*. at 101:4–14, 19–23. Sergeant Sellers drove past the Chevy Malibu and observed Castaneda still sitting in the driver's seat. *Id*. Sergeant Sellers parked his vehicle on the east side of the street facing southbound, just south of Castaneda's parked vehicle. *Id*. at 100:23–25.

Less than five minutes later, Sergeant Sellers observed a light-colored Honda turn onto 23rd Avenue. *Id*. at 103:11–13, 117:16–17. The Honda parked on the eastside of the street, across the street from Castaneda's vehicle and north of Sergeant Sellers' vehicle. *Id*. at 103:11–13. Sergeant Sellers' vehicle remained approximately two to three cars in front of the Honda. *Id*. at 130:18–23.

Based upon previous intelligence reports, Sergeant Sellers recognized the Honda as one that Castaneda's couriers used. *Id*. at 104:2–5. Sergeant Sellers also identified Santos Godina as he exited the driver's side of the Honda.[5] *Id*. at 104:8–9. Godina carried a red cloth bag in his hand as he walked toward a white Land Rover parked behind the Honda. *Id*. at 104:8–11. Sergeant Sellers saw Godina approach the Land

---

[5] As noted above, as of April 11, 2016, law enforcement possessed detailed information that identified Santos Godina as Castaneda's drug courier who lived in LaSalle County and worked selling drugs in the Chicago area. Tr. [240] 14:13–17, 40:14–15; Tr. [241] at 96:13–16.

Rover's driver's side door, but never observed Godina speak with the Land Rover's driver, who law enforcement later identified as Defendant Eugene Alexander. *Id.* at 120:13–15. Upon approach, Godina immediately reached into the Land Rover's driver's side window with the red cloth bag still in his hand. *Id.* at 104:8–12. Sergeant Sellers observed Godina extend half of his arm into the vehicle. *Id.* at 120:24–25. When Godina removed his arm from inside the Land Rover, he no longer held the red cloth bag; instead, Godina held a clear, opaque plastic bag in his hand. *Id.* at 104:12–13, 124:5–6. Based upon the surveillance, Sergeant Sellers believed the clear plastic bag contained a heavy object (or objects) because it appeared weighted down and semi-rounded, as opposed to flat. *Id.* at 104:14, 123:11–21.

After the quick exchange of bags, Godina walked away from Defendant's vehicle while crunching the top of the clear bag with his right hand. *Id.* at 124:11–15. He returned to the Honda and entered on the driver's side. *Id.* at 104:14–17; [204-1] at 21. Sergeant Sellers did not observe Godina walk anywhere else but to Defendant's vehicle and immediately back to the Honda. Tr. [241] 106:12–15. Sergeant Sellers never observed Godina speak to Defendant or Castaneda during the transaction. *Id.* at 120:13–15, 127:15–17.

Sergeant Sellers maintained a rear visual of Castaneda's Malibu and Godina's Honda throughout the duration of the bag exchange. *Id.* at 103:7–8, 14–23. Sergeant Sellers also maintained a rear visual of Defendant's Land Rover, though he could not see through the Land Rover's front windshield. *Id.* at 119:9–11, 16–17. During his

12

surveillance, Sergeant Sellers relayed his observations to the other task force officers using the radio. *Id*. at 108:13–16.

Based upon his training and experience, the information learned in the wiretap investigation and the observations made during the surveillance, Sergeant Sellers believed that a suspect narcotics transaction occurred between Defendant and Godina. *Id*. at 106:25–26:9.[6]

### G.     Surveillance, High-Speed Chase, and Stop of the Defendant

After the bag exchange, Sergeant Sellers observed all three vehicles pull away, traveling southbound to Main Street. *Id*. at 110:3–7. Defendant departed first. *Id*. at 108:3–4. Next, Castaneda began departing but then stopped in the middle of the street, *id*. at 108:4–5, remaining there until Godina pulled up behind Castaneda's vehicle, *id*. at 108:6. Castaneda and Godina then drove away in tandem. *Id*. at 108:6–7. Sergeant Sellers relayed his observations of this concerted activity over the radio to the other TFOs who remained in the nearby vicinity during the transaction and ongoing surveillance. *Id*. at 110:24–111:4, 148:10.

Multiple agents covertly followed the three vehicles. *Id*. at 112:5–13. FBI Special Agents Michael Ford and Frank Teutonico, assisting with surveillance, heard Sergeant Sellers' communications over the radio. *Id*. at 148:8–13. Special Agent Ford

---

[6] As of April 11, 2016, Sergeant Sellers had no personal knowledge yet of the recent surveilled calls between Castaneda and CS-3 on which Castaneda indicated that he did not have narcotics available earlier in the day. *Id*. at 121:12–15, 122:6–13. Sergeant Sellers testified that having this knowledge would not have changed his opinion that he observed a narcotics transaction. *Id*. at 132:10–14.

observed Defendant's Land Rover travel down Main Street and began following behind it. *Id*. at 148:14–16. All three vehicles stopped in traffic on Main Street as a train passed through the intersection of Main Street and 19th Street. [204-1] at 42. After the train traveled through, the three vehicles resumed traveling. *Id*.

Castaneda and Godina both traveled southbound on 19th Street and passed Washington Boulevard, eventually driving in a different direction than Defendant. Tr. [241] at 112:11–13. The agents stopped surveilling Castaneda and Godina. [204-1] at 41. Meanwhile, Special Agents Ford and Teutonico continued following behind Defendant's Land Rover. Tr. [241] at 150:7–8, 151:2. Defendant traveled southbound on 19th Street and turned onto Washington Boulevard, traveling eastbound. *Id*. at 150:6–7.

Based upon his training and experience, and the information learned in the investigation (including Sergeant Sellers' observations of the bag exchange), Special Agent Gildein believed that Defendant's vehicle contained narcotics or narcotics proceeds. Tr. [240] 30:17–18. Therefore, once Defendant turned onto Washington Boulevard, Special Agent Gildein instructed Special Agents Ford and Teutonico to conduct a traffic stop of Defendant's vehicle. Tr. [241] 152:9–10, 128:20–21.

At approximately 11:29 a.m., Defendant approached Washington Boulevard and 11th Avenue, a four-way intersection. [204-1] at 42. Washington Boulevard comprises two traffic lanes, with one lane in each direction. Tr. [241] at 167:2–4; [204-1] at 42. Special Agent Ford planned on pulling in front of Defendant's vehicle to effectuate the

14

stop at the intersection. Tr. [241] 169:7–8. Special Agent Ford testified that, based upon the width of the street, he saw that both vehicles would fit in one lane, *id*. at 169:10–11, and that his vehicle never entered oncoming traffic as he pulled up to Defendant's vehicle, *id*. at 181:23–25; 182:4–7. Special Agent Teutonico's vehicle remained behind Defendant's vehicle. *Id*. As Special Agent Ford pulled up alongside Defendant's vehicle, Defendant sped away, making a left-hand turn in front of Special Agent Ford's vehicle, cutting him off and crossing the lane before traveling northbound on 11th Avenue. *Id*. at 152:18–19, 182:12–16.

In response, while still on Washington Boulevard, Special Agents Ford and Teutonico both activated their emergency lights and sirens and gave chase. *Id*. at 152:20, 155:13–15, 21–24. The officers traveled in covert vehicles, so the emergency lights rested inside their vehicles behind the windshield and could not be easily seen from the outside until activation. *Id*. at 161:16–17, 18–20. The agents pursued Defendant's fleeing vehicle, turning onto 11th Avenue and maintaining radio contact with fellow law enforcement. *Id*. at 152:23–153:1. All vehicles traveled at a high rate of speed for a residential area. *Id*. at 153:2–3, 9.

Meanwhile, FBI Special Agent Tyler Kazee, also assisting with surveillance, was traveling eastbound on Oak Street when he observed Defendant's fleeing vehicle driving westbound toward him. *Id*. at 156:12–15, 200:2. Special Agent Kazee pulled his vehicle into the westbound lane, facing eastbound, thus blocking the road. *Id*. at 200:6–7. At that point, Defendant continued traveling toward Special Agent Kazee's

15

vehicle at a high rate of speed, so Special Agent Kazee braced himself for impact. *Id*. at 200:23–25. Special Agent Kazee further observed Special Agents Ford and Teutonico traveling behind Defendant with their emergency lights and sirens activated. *Id*. at 200:13–15. Defendant stopped his vehicle, however, before making impact with Special Agent Kazee's vehicle. *Id*. at 200:25. Special Agent Kazee also activated his emergency lights and drew his weapon. *Id*. at 201:18–19. Thereafter, Special Agent Kazee observed Defendant in the driver's seat with his hands in the air. *Id*. at 201:19–24.

Special Agent Teutonico then approached the driver's side of Defendant's vehicle, while Special Agent Ford approached the passenger side. *Id*. at 157:1–3. Special Agent Ford drew his weapon as he approached. *Id*. at 174:3–4, 8. Special Agent Teutonico opened the driver's side door and removed Defendant from the vehicle. *Id*. at 157:4–5. Special Agent Teutonico then secured Defendant at the vehicle using Special Agent Ford's handcuffs. *Id*. at 175:17–18. Special Agent Kazee holstered his weapon upon seeing Defendant handcuffed and lying on the ground. *Id*. at 202:10. Special Agent Ford also observed Defendant on the ground. *Id*. at 174:23–175:7.

While Defendant remained handcuffed, Special Agent Kazee approached the driver's side door. *Id*. at 203:1–2. From the driver's side door, Special Agent Kazee observed a red cloth bag on the rear passenger floorboard in plain view that matched Sergeant Sellers' earlier description. *Id*. at 203:4–6. Special Agent Kazee reached into the vehicle through the open driver's side door and recovered the red cloth bag located on the rear passenger floorboard. *Id*. at 203:13–14. Special Agent Kazee examined the

16

contents of the red cloth bag, observing two brick-shaped objects, wrapped in multiple layers of tape, and a cell phone. *Id.* at 203:18–20; [204-1] at 43. Both brick-shaped objects contained a white powdery substance which later field tested positive for the presence of cocaine. [204-1] at 43. The brick-shaped objects weighed approximately 3,770 grams combined, equivalent to approximately 3.7 kilograms. *Id.* Law enforcement officers did not conduct any other search of Defendant's vehicle at the scene. *Id.*

Special Agent Ford then removed the handcuffs from Defendant. Tr. [241] 176:25. Once uncuffed, Defendant asked Special Agent Ford if "this was a robbery." *Id.* at 176:25–177:1. As part of the ongoing covert wiretap investigation, Special Agent Ford did not arrest Defendant at that time, and instead told him to leave; Defendant then left in his Land Rover. *Id.* at 177:1; [204-1] at 44; Tr. [241] 177:6–8, 11–18.

## II.    Conclusions of Law

Defendant claims that the stop and search of his vehicle violated the Fourth Amendment, because law enforcement lacked reasonable suspicion (or probable cause) to believe a drug transaction occurred and possessed no particularized information about Defendant prior to April 11, 2016, and relied instead upon his mere proximity to Castaneda to stop him. [192] at 4; [206] at 2. This Court disagrees and finds that law enforcement possessed specific and articulable facts showing that Defendant participated in a narcotics transaction, and thus possessed, at the very least, reasonable

suspicion to lawfully stop him.[7]   Additionally, this Court also finds that the factual record provided the agents with probable cause for both a lawful arrest (if they had chosen to make one) and search under the totality of the circumstances.

## A.   Agents Conducted A Lawful *Terry* Stop

Consistent with precedent, this Court first addresses Defendant's motion under *Terry v. Ohio*, 392 U.S. 1, 21 (1968).  *See United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020).

### 1.   Reasonable Suspicion Standard

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.  In general, under this amendment, a "warrantless arrest, like a warrantless search, must be supported by probable cause."  *United States v. Navarro*, 90 F.3d 1245, 1254 (7th Cir. 1996); *see also United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020).

---

[7] Given the testimony at the hearing, the parties submitted supplemental briefing on whether Defendant committed a traffic violation when agents attempted to stop his vehicle.  [245]; [246].  Even though the parties agreed that a traffic violation did not factor into the testifying officers' decision to detain the Defendant, an alternate justification to make the stop exists if the officers possessed a sufficient basis "to believe that a traffic violation has occurred."  *Whren v. United States*, 517 U.S. 806, 810 (1996); *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).  Despite the government's concession that it need not rely upon this legal theory to defeat Defendant's motion, this Court finds, as a factual matter, that the Defendant committed multiple traffic violations when he drove his vehicle in a reckless matter, including at the moment when he made a left turn that cutoff the agents' car and crossed through the intersection at the outset of his high speed flight in a residential area.  As such, this Court finds that this conduct provides an alternate legal justification for the agents' actions.

18

An exception, however, exists under the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1, 21 (1968), which holds that law enforcement may detain a suspect for a brief investigatory stop if they have a "reasonable suspicion based on articulable facts that a crime is about to be or has been committed." *United States v. Williams*, 731 F.3d 678, 683 (7th Cir. 2013) (quoting *United States v. Carlisle,* 614 F.3d 750, 754 (7th Cir. 2010)); *see also Jackson*, 962 F.3d at 357 (noting that probable cause is not required; instead, "reasonable suspicion of a traffic violation provides a sufficient basis to justify a traffic stop"). Reasonable suspicion "is more than a hunch but less than probable cause and considerably less than preponderance of the evidence." *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008) (internal quotations omitted). It requires "some minimal level of objective justification for making a stop," given the "totality of the circumstances" and "common-sensical judgments and inferences about human behavior." *Id.* (internal quotations omitted).

When observed by trained law enforcement officers, "objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion." *United States v. Cortez*, 449 U.S. 411, 419 (1981). Moreover, because this Court evaluates reasonable suspicion in light of the totality of the circumstances, "certain behavior . . . may give rise to reasonable suspicion when viewed in the context of other factors at play." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). Ultimately, determining whether "reasonable suspicion exists is not an exact science,

19

and 'must be based on commonsense judgments and inferences about human behavior.'" *Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).

Additionally, under the "collective knowledge" doctrine, law enforcement agents who make a stop "need not personally know all the facts" if they "reasonably are acting at the direction of another officer or police agency." *United States v. Howard*, 883 F.3d 703, 707 (7th Cir. 2018) (quotations and citations omitted). In such cases, a stop is proper so long as the "collective knowledge of the agency" is sufficient. *Id.*; *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010) (holding that an officer's stop is reasonable if it is based upon "the collective knowledge" of officers investigating as part of a joint endeavor, even if the individual arresting officer's firsthand knowledge remains insufficient on its own); *see also United States v. Ledford,* 218 F.3d 684, 689 (7th Cir. 2000) (holding that if the search or seizure constitutes a "joint endeavor," the court may properly consider what other officers knew and impute that collective knowledge to the officers taking action).

## 2. *Terry* Stop Occurred When Defendant Yielded to Authority

Under *Terry*, this Court must determine exactly when law enforcement seized Defendant within the meaning of the Fourth Amendment. The Supreme Court has instructed that "a person is seized only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall,* 446 U.S. 544, 554–55 (1980) (internal quotations omitted); *see also California v. Hodari*, 499

20

U.S. 621, 628 (1991) (finding that a seizure did not occur during a police car chase that used emergency lights because the initial show of authority did not produce the defendant's stop).

Based upon this standard, on April 11, 2016, law enforcement seized Defendant within the meaning of the Fourth Amendment when, after his initial flight and high-speed chase, he finally stopped his car in response to Special Agent's Kazee's blockade. Here, Defendant did not stop when law enforcement officers first activated their lights and sirens. Instead, Defendant continued to flee driving at a high rate of speed until he encountered Special Agent Kazee's vehicle blocking off the street, at which point Defendant stopped his vehicle. Tr. [241] 200:23–25. Thus, a Fourth Amendment seizure of Defendant occurred only when he abandoned his flight and yielded to this show of authority. *United States v. Mays*, 819 F.3d 951, 956 (7th Cir. 2016) ("Even when somebody is confronted with an obvious show of authority, he is not seized until his freedom of movement is terminated by an application of physical force or by the suspect's submission to the asserted authority.") (quoting *United States v. $32,400.00, in U.S. Currency*, 82 F.3d 135, 138–39 (7th Cir. 1996)).

### 3. Facts Justified the Agent's Actions Under *Terry*

Having determined that Defendant's traffic stop constituted a seizure at that point in time, this Court must determine whether that seizure exceeded the bounds of a lawful *Terry* stop. As noted above, this Court's inquiry turns upon "(1) whether the police were aware of specific and articulable facts giving rise to reasonable suspicion;

21

and (2) whether the degree of intrusion was reasonably related to the known facts." *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011).

As noted in detail above, the record shows that on April 11, 2016, agents observed Castaneda (a known leader in the DTO) park his vehicle on a residential street, wait in his car for others, and engage in suspected counter-surveillance. [204-1] at 40; Tr. [241] 100:13–15. Minutes later, Godina (a known courier for Castaneda's DTO) arrived at the same location and parked his vehicle on the opposite side of the street. Tr. [241] 103:11–13. Once Godina parked, Sergeant Sellers observed Godina exit his vehicle holding a red cloth bag and walk over to the parked Land Rover with Defendant waiting inside. *Id*. at 104:8–11. Without any observed predicate conversation between any of the parties, Godina immediately reached his arm into the vehicle while holding the red cloth bag, and then pulled his arm out of the window, holding a different bag that Sergeant Sellers described as clear in color and weighted down with something heavy. *Id*. at 108:11–14. After this bag exchange, Godina quickly returned to his vehicle, again without speaking to Castaneda or Defendant. *Id*. at 106:12–15. All three parties then drove off, with Godina and Castaneda driving in tandem. *Id*. at 107:5–6. The entire bag exchange transpired quickly, lasting only a minute or two. *Id*. at 107:12–15, 133:13–18.

Given their training and experience and the context of the larger wiretap investigation, the agents collectively possessed an ample and reasonable factual basis to believe that a suspect drug transaction occurred—especially in light of the known roles

22

of the codefendants Godina and Castaneda within the DTO,[8] and the specific circumstances and pre-arranged nature of this bag exchange (including its location, brevity and absence of any observable conversation), as well as Defendant's subsequent flight. For example, Sergeant Sellers' observations supported a commonsense inference that Castaneda engaged in counter-surveillance to support Defendant and Godina's consummation of a narcotics transaction. Tr. [240] at 27:16–19. Neither Castaneda nor Godina lived in, or even near, Melrose Park, Illinois where the transaction occurred. *Id.* at 14:17, 30:22–24. Yet, in concerted fashion, they both arrived at the same location, in separate vehicles, within minutes of one another. Although Castaneda arrived before Godina, he pulled away immediately after Godina returned to his vehicle. Tr. [241] 106:8–9, 17–18. Even then, Castaneda waited for Godina's vehicle to follow him before they drove away in tandem. *Id.* at 108:4–7. Likewise, Defendant's own suspicious actions and ensuing flight supported a commonsense inference that he also engaged in the narcotics transaction: "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Wardlow*, 528 U.S. at 124–25; *Whren v. United States*, 517 U.S. 806, 810 (1996). Although Sergeant Sellers could not know with certainty whether the bags Defendant

---

[8] Prior to April 11, 2016, law enforcement conducted a detailed investigation that revealed: (1) Ricardo Castaneda operated a DTO, distributing heroin and cocaine in the Chicago area; and (2) Santos Godina worked as Castaneda's courier, transporting and retrieving narcotic related currency from their customers. [204-1] at 20. Based upon the investigation, law enforcement also knew that Castaneda and Godina traveled "a couple of hours" from their homes to Chicago for the purpose of the concerted activity observed that day, including the suspicious bag exchange with the waiting Defendant. Tr. [240] 31:19–24.

and Godina exchanged contained narcotics or narcotics proceeds, such evidence remained unnecessary to support reasonable suspicion for the narcotics transaction in light of the other facts within the officers' collective knowledge. *See United States v. Ruiz*, 785 F.3d 1134, 1143 (7th Cir. 2015) (finding that reasonable suspicion existed where Defendant's actions remained consistent with drug trafficking even though officers did not see the defendant carrying anything that might have contained drugs).

In sum, this Court finds that based upon the wiretap investigation and the surveillance of the bag-exchange itself, including the subsequent flight by the Defendant that followed it, the agents possessed more than enough facts for reasonable suspicion to justify their seizure.[9]

Having determined that, at the very least, reasonable suspicion supported an investigatory stop of Defendant's vehicle, this Court next inquires whether the degree of intrusion officers used reasonably related to the known facts. *Bullock*, 632 F.3d at 1012.

---

[9] Despite this common-sense conclusion, Defendant argues that Castaneda's discussions of narcotics-related activities on CS-3's recorded telephone calls and text messages undermine the notion that law enforcement possessed reasonable suspicion that Defendant would engage in a narcotics transaction with the Castaneda DTO on April 11. [206] at 3–4. Defendant points specifically to an April 11 text message from Castaneda stating that he did not have narcotics for him but may receive a supply the following day. *Id*. at 3. Such statements, however, fail to undercut law enforcement's firsthand observations, as detailed above; and, as Sergeant Sellers testified, Castaneda's text (unknown to the Sergeant Sellers at the time) would not have changed his expert opinion that a narcotics transaction occurred. Tr. [241] 132:10–19. Among other reasonable inferences, in the text, Castaneda may have been putting off one customer to sell to another, may have obtained drugs earlier than expected, may have been re-supplying a day early, or may have just been lying. In any event, the facts fully support the lawfulness of the agents' action under either a reasonable suspicion or probable cause standard. *See, e.g., United States v. Gary*, 790 F.3d 704, 707–08 (7th Cir. 2015) (even though there "could have been innocent explanations" for the defendants' actions, "the inference of the criminal activity was reasonable for purposes of probable cause") (citing *United States v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003) (finding probable cause where "the inference of illegal conduct by trained and experienced officers is at least as probable as any innocent inference")).

Defendant contends that the investigatory stop exceeded its lawful purpose and ripened into a de facto arrest when law enforcement removed him from his vehicle and handcuffed him without reasonable suspicion or probable cause. [192] at 4.

Although an investigatory stop requires only reasonable suspicion, probable cause may be required when a stop evolves into a de facto arrest. *United States v. Tilmon*, 19 F.3d 1221, 1224–25 (7th Cir. 1994) (finding that "probable cause may be required when police restraint is so intrusive that, while not technically an arrest, it may be tantamount to an arrest.") (internal quotations omitted). Because a "*Terry* stop based on reasonable suspicion can ripen into a de facto arrest that must be based on probable cause if it continues too long or becomes unreasonably intrusive," the detention must be "reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests*." Bullock*, 632 F.3d at 1015. Nonetheless, using "handcuffs, placing suspects in police cars, drawing weapons, and other measures of force more traditionally associated with arrests may be proper during an investigatory detention, depending on the circumstances." *Id.* at 1016; *see also Tilmon*, 19 F.3d at 1224–25 ("For better or for worse, the trend has led to the permitting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention."). Inherent dangers exist "in stopping those suspected of drug trafficking, for which guns are known tools of the

trade." *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005). Thus, drug arrests can "warrant intrusive tactics because of their inherent danger." *Id.* at 508.

Here, the agents reasonably suspected that Defendant engaged in a drug transaction with members of the Castaneda DTO, a known-narcotics trafficking organization. Their actions—stopping Defendant's car, drawing weapons, and placing Defendant in handcuffs—remained reasonable under the circumstances of this drug-related arrest. *See, e.g.*, *id.* (concluding that the FBI acted reasonably in "neutralizing" the defendant, a suspected member of a PCP distribution ring, by surrounding his car and drawing their weapons); *Bullock*, 632 F.3d at 1016 (finding that officers acted with a reasonable degree of intrusion where they placed the defendant in handcuffs and in the squad car as they searched for drugs). Moreover, by the time law enforcement stopped him, Defendant had already endangered others by fleeing in his car, and any further attempt Defendant might make to flee in his car would undoubtedly carry the "potential to harm large numbers of innocent bystanders or the law enforcement officers attempting to execute the arrest." *Askew*, 403 F.3d at 508; Tr. [241] 200:23–25.

Based upon the factual record, this Court finds that law enforcement used a reasonable degree of intrusion supporting a lawful *Terry* stop that did not ripen into a de facto arrest. In any event, this Court also finds, in the alternative, that the facts provided the agents with probable cause to conduct an arrest or search (if necessary).

**B.    The Officers Lawfully Searched Defendant's Vehicle**

Finally, the search of Defendant's vehicle must be analyzed separately from his lawful *Terry* stop.  Warrantless searches are "per se unreasonable under the Fourth Amendment unless they fall within 'a few specifically established and well-delineated exceptions.'" *United States v. Charles*, 801 F.3d 855, 860 (7th Cir. 2015) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)).  The government must show by a preponderance of the evidence that an exception applies.  *United States v. Stewart*, 902 F.3d 664, 674 (7th Cir. 2018).

Here, the government relies upon the automobile exception, which "permits the police to search a vehicle if there is probable cause to believe it contains evidence of criminal activity."  *Charles*, 801 F.3d at 860.  When probable cause exists to search a vehicle, the authority to search "encompasses any area of the vehicle where evidence of the crime might be found," including "containers within the vehicle that could hold such evidence."  *Id.*  Probable cause exists "when based on the known facts and circumstances, a reasonably prudent person would believe that contraband or evidence of a crime will be found in the place to be searched."  *United States v. Richards*, 719 F.3d 746, 754 (7th Cir. 2013) (internal quotations omitted).  The relevant circumstances encompass the entire factual picture, including rational inferences drawn from the facts based upon the experience of the officers; and thus, the existence of probable cause "does not deal with hard certainties," but rather "with probabilities."  *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (quoting *United States v. Cortez,* 449 U.S. 411, 418 (1981)).  Though probable

cause requires "something more than a hunch," it does not require a finding that an individual actually engaged in unlawful activity. *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013); *United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003) ("Probable cause requires only a substantial chance of criminal activity, not an actual showing of such activity.") (citing *Gates*, 462 U.S. at 244 n.13). In assessing probable cause, this Court's inquiry remains an objective one; the subjective motivations of the officer cannot invalidate a search or seizure otherwise supported by probable cause. *See Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 457 (7th Cir. 2010). In other words, although this Court focuses upon what the officers knew collectively "at the time of the arrest," it must determine "whether those facts and circumstances, 'viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause.'" *Id.* (quoting *Maryland v. Pringle,* 540 U.S. 366, 371 (2003)).

Here, the totality of the circumstances provided trained agents probable cause to search Defendant's vehicle for evidence of an illegal drug transaction. The co-conspiratorial statements established the roles of the codefendants within the DTO conspiracy on scene, and subsequent observations confirmed Defendant's involvement and the existence of a preconceived plan when he and those two codefendants (and no others) drove to the ostensibly pre-arranged site and exchanged the bags. Immediately thereafter, Defendant fled the agents driving recklessly until they eventually blocked his vehicle. An objectively reasonable officer could easily infer, based upon the totality of the circumstances, that Defendant played an active part in the planned criminal

28

activity and that Defendant's vehicle contained contraband or evidence of a crime. Therefore, the government has carried its burden to show that probable cause (not just reasonable suspicion) existed for law enforcement to detain Defendant (or in the alternative arrest him), and to otherwise search his vehicle and any containers, including the red bag observed in plain view within the vehicle. *Williams*, 627 F.3d at 251 (holding that when probable cause exists to search a vehicle, law enforcement may search all parts of the vehicle in which contraband could be concealed, including closed compartments, containers, packages, and trunks); *see also, e.g.*, *United States v. Zahursky*, 580 F.3d 515, 523 (7th Cir. 2009) (holding that the officers' probable cause to search the defendant's vehicle encompassed the entire vehicle, including the glove compartment and trunk).

The application of the automobile exception forecloses Defendant's complaint of an unconstitutional search. This Court will nonetheless address Defendant's arguments pertaining to a second possible warrant exception—known as the *Gant* exception— which authorizes a warrantless search of a vehicle incident to an arrest where "the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Gant*, 556 U.S. at 351. Defendant argues that Special Agent Kazee violated *Gant's* parameters by searching Defendant's vehicle because the arrest was unlawful and because Defendant was already handcuffed when law enforcement conducted the search. [192] at 8. These arguments lack merit.

Initially, as this Court has already ruled, Defendant's detention remained lawful under *Terry* and did not escalate into a de facto arrest. The *Gant* exception, which requires the existence of an arrest, is thus inapplicable here. *See United States v. Edwards*, 769 U.S. 509, 514 (7th Cir. 2004) (noting that "the suspicion required for a vehicle search incident to the arrest under *Gant* is keyed to the offense of the arrest").

Even assuming the stop transformed into a de facto arrest, however, this Court has found the evidence more than sufficient to show that the officers possessed probable cause to make a *lawful* arrest. Finally, the fact that Defendant remained handcuffed and on the ground during the search is immaterial: the *Gant* exception applies if *either* Defendant was within reaching distance of the passenger compartment at the time of the search *or* law enforcement reasonably believed his vehicle contained evidence of the drug transaction. *Edwards*, 769 F.3d at 514 ("Because Edwards was handcuffed and sitting in the back of the police squad when Sergeant Pufall searched the Mitsubishi, only the second justification for a search incident to arrest is available here."); *see also United States v. Paige*, 870 F.3d 693, 702 (7th Cir. 2017) (observing that the *Gant* exception permits searching the defendant's vehicle incident to a lawful arrest if "it is reasonable to believe the vehicle contains evidence of the offense of arrest") (internal quotation marks omitted). The totality of the circumstances abundantly supports the conclusion that the officers possessed reasonable belief that Defendant's vehicle contained evidence of the drug transaction and were justified in looking into the vehicle and making a seizure and on-scene search of the red bag sitting in plain view. Thus, to

30

the extent Defendant's stop ripened into a de facto arrest, the *Gant* exception also justifies the government's warrantless search of Defendant's vehicle.

## III. Conclusion

Based upon the above, Defendant's motion to suppress evidence [192] is denied.

Dated: November 19, 2020

ENTERED:

John Robert Blakey
United States District Judge
Northern District of Illinois